**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-CR-20188-RAR**

**UNITED STATES OF AMERICA**

**v.**

**BRANDON SARTOR,**

**Defendant**

______________________________/

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Trial Attorney and Assistant United States Attorney, hereby submits this Sentencing Memorandum.

The Defendant, Brandon Sartor, engaged in calculated, egregious, and predatory criminal conduct by using violence, threats, and sexual assault to compel two women to engage in commercial sex acts for his financial benefit. The Presentence Investigation Report ("PSR") correctly calculates the sentencing guideline range as 292 to 365 months. The Government concurs with the sentencing guideline range and recommends that this Court impose a sentence of 365 months and award $259,800 in restitution to the victims. This sentence will reflect the seriousness of the offense, provide a just punishment, afford adequate deterrence, and protect the public from further crimes of the Defendant, while complying with the other factors the Court must consider under Title 18 United States Code, Section 3553(a).

## I. PROCEDURAL POSTURE

On May 12, 2026, Sartor was charged by indictment with sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591; using a facility of interstate commerce to facilitate the

promotion of a prostitution business enterprise, in violation of 18 U.S.C. § 1952; transporting individuals across state lines with the intent that they engage in prostitution or other criminal sexual activities, in violation of 18 U.S.C. § 2421; and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF 1.) On August 27, 2026, Sartor pled guilty to two counts of sex trafficking by force, fraud, or coercion in violation of 8 U.S.C. § 1591. The PSR was filed on October 23, 2026. (ECF 31.) Sentencing is scheduled for November 17, 2026, at 1:30 p.m. (ECF 29.)

## II. FACTUAL BACKGROUND[1]

In August 2020, Sartor pleaded guilty and was sentenced to eight years in prison for a misdemeanor sex trafficking offense in Maryland. In 2024, Maryland released Sartor pursuant to his request to complete court-ordered treatment as an alternative to incarceration. Immediately thereafter, Sartor began sex trafficking two young women named in the Indictment as Victim 1 and Victim 2.

### A. Victim 1 (Count 1)

At age 22, Victim 1 was struggling to provide for herself and her son when she met two girls through foster care who told her how she could make “a lot of money” by posting online commercial sex advertisements. The girls showed Victim 1 how to use these websites, and she began occasionally posting commercial sex advertisements on Megapersonals.com. She was in charge of her schedule and kept all the money she made.

In December 2024, Sartor responded to one of her advertisements. He promised Victim 1 she would make an exorbitant amount of money if she worked with him. Sartor also said he could

[1] This Factual Background is supported by the PSR (ECF 31), Stipulated Factual Proffer (ECF 28), and grand jury testimony from Victim 1 and Victim 2.

provide her with Percocet and marijuana, which she was using daily at the time, and nice hotel rooms. Based on these representations, Victim 1 agreed to work with Sartor.

On the day Victim 1 met Sartor, he had sex with her and then directed her to post an advertisement and perform commercial sex dates for him in Maryland. Sartor proceeded to compel Victim 1 to perform commercial sex dates for his financial benefit every single day she was with him. Sartor would decide how much money to charge, and she always gave him all the money she made. If she did not, Sartor would "beat her up."

Between December 2024 and January 2025, Sartor drove Victim 1 from Maryland to Delaware and then Pennsylvania to perform commercial sex dates for his financial benefit. In February 2025, Sartor flew Victim 1 to South Carolina to continue working in his commercial sex enterprise. When Victim 1 arrived in South Carolina, she met Victim 2 and observed Sartor provide Victim 2 with "dope and coke every single day." Victim 1 and Victim 2 did commercial sex dates for Sartor in South Carolina for a few weeks until Sartor took them to Atlanta, where Sartor directed Victim 1 to continue posting advertisement and doing dates for his financial benefit.

From Atlanta, Sartor drove Victim 1 and Victim 2 to Orlando, and then Miami, to continue working in his commercial sex enterprise. As was the case in Maryland, Delaware, Pennsylvania, South Carolina, and Georgia, Sartor would post commercial sex advertisements for Victims 1 and 2 on Megapersonals.com or Skipthegames.com and kept all the proceeds from their commercial sex dates. Sartor would direct Victim 1 to Facetime with clients to verify that they were not law enforcement and he had a rule that she was not allowed to have commercial sex dates with Black customers under the age of 35. Sartor directed Victim 1 to charge between $150 and $400 for each date. On a "low" day, she would only have one date, but on a "high" day, she would have ten dates. She did not have any days off or sick days. Victim 1 did not have any scheduled hours but would

work "whenever Sartor wanted her to." Sartor would get angry when she did not make as much money on any certain day and would either beat her or verbally abuse her, calling her "fat" or telling her she was a "bad mom" for abandoning her son.

During the four months she was with him, Victim 1 estimates that Sartor beat her once a week. On one occasion, Sartor spit on her, told her to "shut up," pulled a knife out, and backhanded her. On another, he gave her a black eye and bloody lip. Sartor's physical violence was sometimes linked to his frustration with Victim 1 for not making enough money, taking too long on dates, or "talking back" to him when he gave her instructions. Other times, it was random. Victim 1 also saw Sartor hit Victim 2. She would ask Sartor to stop, saying "Don't hit [Victim 2]. She's so little." Sartor did not listen and "smacked" Victim 2 so hard she had to go to the hospital.

While he was physically assaulting Victim 1, and at all other times, Sartor carried at least two firearms. He did not let anyone else hold or use the guns, and he kept them on his person all the time except when he was sleeping. Law enforcement seized two guns from Sartor when he was arrested in Miami.

Sartor also employed verbal and psychological tools to control Victim 1. Sartor was the supplier for Victim 1's drugs—both Percocet and marijuana. While she was with Sartor, Victim 1 had limited access to her phone. Sartor had her phone almost 24/7, except when she needed to take it to a date and text Sartor to confirm that she received the money from the date. Intermittent with this physical and verbal abuse, Sartor would make pledges of romance and love to Victim 1, telling her that she was the most loyal.

Indeed, loyalty was paramount for Sartor. He often told Victim 1 that if she was not loyal to him or thought about leaving, he would leave her in the middle of nowhere, or that he would "get" her sister, who was pregnant with her niece at the time. Sartor also constantly warned Victim

1 about "snitching" and told her to refer to him as "Bryan" if law enforcement asked her about him. In April 2025, Victim 1 reached a breaking point and bought a bus ticket back to Maryland.

**B. Victim 2 (Count 2)**

Victim 2 met Sartor at a hotel in Maryland in early 2025. At the time, Victim 2 was moving to South Carolina with a friend to try and get sober. She only had a couple hundred dollars to her name and was using cocaine and heroin daily. Sartor provided her with drugs and told her he could help her make a lot of money. Victim 2 felt desperate and decided to work with him. Sartor drove Victim 2 to South Carolina the next day.

Almost immediately after arriving in South Carolina, Sartor had sex with Victim 2—something she did not want to do. A few days later, Victim 2 overdosed and became unconscious. When she woke up on the floor, Sartor laughed as he told her she had a seizure and: "I fucked you so hard you were shitting all over me." Sartor did not take Victim 2 to the hospital but instead continued to post commercial sex advertisements for her and directed her to meet dates for his financial benefit. Victim 2 did dates for his benefit for approximately ten days while they were in South Carolina. Victim 2 met Victim 1 in South Carolina.

Sartor also directed Victim 2 to perform commercial sex dates for his financial benefit in Atlanta every day for approximately one month. Sartor collected all proceeds from her commercial sex dates and began escalating his control over her movements and communication by maintaining control over Victim 2's phone.

In March 2025, Sartor decided to move Victims 1 and 2 to Florida. First, he took them to Orlando, where Victim 2 did not do any commercial sex dates because she was hospitalized for approximately one week after Sartor punched her multiple times in the face where she already had

an infection. When Victim 2 was released from the hospital, Sartor was waiting to pick her up. They spent one more night in Orlando and then drove to Miami.

Soon after arriving in Miami, Sartor physically assaulted Victim 2 yet again—this time, because she was not getting a lot of calls in response to the advertisements he posted of her. In the garage of a hotel in Miami, Sartor raped Victim 2, saying, "I'm going to punish you with my dick." Sartor hit Victim 2 multiple times in the face, and then put his hand on her mouth saying, "Don't scream, the police are gonna hear you."

Victim 2 continued to work in commercial sex in Miami for Sartor due to her fear of additional physical violence. She was also dependent on Sartor for drugs because he was providing her with heroin and cocaine every day, and she would suffer significant withdrawal symptoms if she stopped using them. Sartor drafted the language for the commercial sex advertisements, including sexual acts that Victim 2 did not want to do, despite her protests. While she was on dates, Sartor instructed her to refrain from talking to customers at length, saying "you're here to do one thing and one thing only." Sartor required Victim 2 to work every day, around the clock, on demand. He did not allow her to stop work when she was sick or take any days off. Victim 2 did not have any contact with family members, friends, or any other support while she was with Sartor.

Sartor collected all the proceeds from Victim 2's commercial sex dates. Victim 2 estimates that she made approximately a thousand dollars a day and noted that Sartor "wanted to make as much money as possible." Victim 2 was able to escape Sartor in April 2025, when Sartor was arrested and charged with robbing one of her commercial sex clients at gunpoint.

## III. THE PROBATION OFFICER CORRECTLY CALCULATED DEFENDANT'S PRESENTENCE REPORT

The United States has no objections to the PSR. Therefore, this memorandum only addresses the statutory sentence factors of 18 U.S.C. § 3553 and restitution.

## IV. THE 18 U.S.C. § 3553 FACTORS WARRANT A GUIDELINE SENTENCE OF 365 MONTHS

The Supreme Court has declared, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 41 (2007). This Court, therefore, "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009). When the court, in consideration of the Section 3553 factors, imposes a non-Guidelines sentence, it must give serious consideration "'the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Campbell*, 765 F.3d 1291, 1298 (11th Cir. 2014) (quoting *Gall*, 552 U.S. at 50).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *Campbell*, 765 F.3d at 1298 (describing how the sentencing court should use the "Guidelines range as the benchmark . . . then weigh[]" all of the Section 3553(a) factors).

In this case, considering the nature and circumstances of the offense and the need to reflect the seriousness of the offense and afford adequate deterrence, the government respectfully recommends that Defendant's conduct, considered in conjunction with the sentencing factors set

forth in 18 U.S.C. § 3553(a), calls for a sentence at the high end of the Defendant's advisory guideline range of imprisonment. Such a sentence is sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

**A. <u>Nature and Circumstances of the Offense</u>**

As described above, between December 2024 and April 2025, Sartor engaged in a callous and predatory course of conduct where he used physical violence, threats, and drug-based coercion to compel Victims 1 and 2 to engage in commercial sex for his financial benefit. By so doing, Sartor showed a complete disregard for human dignity and a willingness to exploit some of society's most vulnerable members for his monetary gain. The egregious nature and depraved circumstances of Sartor's conduct warrant the imposition of a sentence at the high end of the Guideline range. The United States is requesting a sentence of 365 months, not only because it is recommended by the Sentencing Guidelines, but also because it is the sentence that fully and appropriately reflects the seriousness of the offense, as well as complies with goals of each of the other 3553(a) factors as explained throughout this memorandum.

1. *Scope of the Defendant's Conduct*

Immediately after being released from prison for sex trafficking offenses, Sartor began trafficking Victim 1 and Victim 2. Over the course of several months, he compelled them to perform commercial sex acts for his financial benefit in Maryland, South Carolina, Georgia, and Florida using brutal violence, rape, degradation, threats, and drug-based coercion. He sent the victims on commercial sex dates to sell their bodies to strangers for his financial benefit. He imposed specific rules about how to conduct the dates, who to conduct dates with, and when to do dates – all with the goal of making more money for himself. To Sartor, these women were commodities he could sell to strangers for his own financial benefit.

2. *The Defendant Targeted and Exploited Vulnerable Young Women*

Sartor engaged in a pattern of conduct where he targeted vulnerable young women struggling with financial instability, tumultuous family lives, substance use disorders, or some combination thereof. Sartor then exploited these vulnerabilities by fraudulently promising the victims a life of luxury and financial security. After identifying and exploiting these vulnerabilities, Sartor used physical force, threats of violence, and drug-based coercion to compel the victims to engage in commercial sex for his financial benefit. Sartor's pattern of using false promises to ensnare his victims and targeting and exploitation of vulnerable women speaks to the predatory nature of his conduct, exacerbates the severity of his crimes, and weighs in favor of a high-end Guideline sentence.

3. *The Defendant's Use of Physical Violence and Threats*

The Defendant's coercive scheme involved violence, rape, threats, drug-based coercion, and fraud. Sartor beat Victim 1 approximately once a week, giving her a black eye and bloody lip on at least one occasion. At times, Sartor's violence toward Victim 1 was because she was not making enough money or taking too long on dates; other times, it was random. Sartor's violence toward Victim 2 was even more egregious, causing her to be hospitalized and leaving her with severe bruises and injuries. Sartor also brutally raped Victim 2 on at least two occasions, which significantly exacerbated his criminal conduct. The serious nature and circumstances of the Defendant's conduct is further aggravated by his use of drug-based coercion. Sartor provided both Victim 1 and Victim 2 with heroin, cocaine, and marijuana as a means to compel them to continue to work for him in his commercial sex enterprise. In sum, the Defendant used violence, rape, drug-based coercion, threats, and fraud to coerce or attempt to coerce vulnerable women to engage in

commercial sex acts with strangers on a daily basis. The scope and nature of this egregious conduct warrant a sentence consistent with the Guidelines.

### B. History and Characteristics of the Defendant

Sartor's criminal history reveals an extensive record spanning the entirety of his adult life, including state and federal convictions for armed robbery and human trafficking. (PSR ¶¶ 69-83.) While the "Offender Characteristics" section of the PSR describes some troubled history in regard to substance use, mental health struggles, and medical problems, Sartor's difficulties do not mitigate his consistent use of violence, threats, rape, and drug-based coercion to compel Victims 1 and 2 to engage in hundreds of commercial sex acts. Further, the PSR documents how Sartor had opportunities to rehabilitate but chose not to do so. Therefore, Sartor's history and characteristics weigh in favor of a Guideline sentence, even acknowledging the challenges he has faced.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Sentencing Disparities

A high-end Guidelines sentence is necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Sartor pled guilty to sex trafficking crimes. The nature of the offenses alone is serious, and a Guideline sentence is necessary to promote respect for the law and provide a just punishment. Additionally, and described above, Sartor's conduct was particularly extensive and heinous given the violent and coercive methods he used to target and compel vulnerable victims. Sartor committed a multitude of serious offenses, and the sentence imposed should reflect the seriousness of this conduct and provide a just punishment.

In enacting the modern human trafficking statutes, Congress explicitly recognized the gravity and seriousness of offenses involving the trafficking of persons and ordered the United

States Sentencing Commission to "take all appropriate measures to ensure that the[] sentencing guidelines and policy statements applicable to the offenses . . . are sufficiently stringent to deter and adequately reflect the heinous nature of such offenses." H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at *27 (Oct. 5, 2000).

Furthermore, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A Guidelines sentence would ensure that Sartor's sentence is comparable to other similarly situated defendants. *See United States v. Flanders*, 752 F.3d 1317, 1341-42 (11th Cir. 2014) (affirming life sentences for two defendants convicted of sex trafficking offenses related to the trafficking of seven victims by fraud); *United States v. Mack*, 808 F.3d 1074, 1078-83 (6th Cir. 2015) (affirming a life sentence against a defendant convicted of four counts of sex trafficking for compelling women to engage in commercial sex by exploiting their drug addictions and creating a "physically abusive atmosphere").

**D. <u>Need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant</u>**

In addition to reflecting the seriousness of the offense and providing just punishment, a high-end Guidelines range sentence is also necessary to afford adequate deterrence and protect the public from future crimes of the Defendant. *See* 18 U.S.C. § 3553(a)(2)(B, C). Sartor trafficked Victim 1 and Victim 2 across many states immediately after being released from prison for human trafficking crimes. The Defendant has never had gainful employment and instead has supported himself through unlawful narcotics sales and commercial sex acts performed by his victims at his direction. (PSR ¶ 107.) *See United States v. Williams,* 5 F.4th 1295, 1308-09 (11th Cir. 2021) (describing, in considering the reasonableness of the sentence, "serious concerns" that defendant

was "likely to recidivate" because, "he had 'almost no employment history' and his 'experience in providing for himself is in trafficking young women'").

Accordingly, a Guidelines sentence is appropriate in this case to afford adequate specific deterrence and protect the public from Sartor's relentless and consistent pattern of trafficking vulnerable women. Furthermore, a Guidelines range sentence would afford necessary general deterrence by deterring others inclined to engage in similar offenses. Sartor's conduct is exactly the type of conduct that the sex trafficking statute proscribes, and the statute was passed, in part, to target such offenses where "[v]ictims are . . . forced through physical violence" and other forms of "coercion" like "sexual abuse," "threats," and "psychological abuse" to "engage in sex acts." H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at *4 (Oct. 5, 2000). A Guidelines range sentence would have the effect that Congress intended in preventing others inclined to commit crimes of this nature.

Furthermore, Sartor's crimes were not crimes of passion—his offenses were tailored to each victim's vulnerabilities and coordinated over periods of time to maximize his profits at the expense of his victims and general deterrence is more apt in cases where the crime is calculated and financially motivated. *See United States v. Howard*, 28 F.4th 180, 208-09 (11th Cir. 2022) (describing, in the context of a financial crime, how "[g]eneral deterrence is more apt, not less apt, in white collar crime cases" because "'economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence'" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013))).

## V. THE COURT MUST ORDER THE DEFENDANT TO PAY RESTITUTION PURSUANT TO SECTION 1593(a).[2]

### A. <u>The TVPA Mandates Restitution for Sex Trafficking Victims</u>.

Congress enacted the Trafficking Victims Protection Act of 2000 (TVPA) to provide a comprehensive set of laws to combat human trafficking under federal law. In relevant part, the TVPA criminalized the commercial sex trafficking of minors and adult victims by force, fraud, and coercion. *See* 18 U.S.C. § 1591. The TVPA has three objectives: (1) prevention of human trafficking; (2) prosecution of traffickers; and (3) protection of victims. *See* Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000), codified as amended in 22 U.S.C. § 7107(a). The TVPA also created one of the most expansive mandatory restitution schemes under federal law, in an acknowledgement that: "[Full restitution] is critical to restoring the trafficking] victim[s]' dignity, helping them gain power back from their exploiters who took advantage of their hope for a better life. [It] . . . attack[s] the greed of the trafficker and the idea of a human being as a commodity. It is a way to ensure that victims receive access to justice." *United States v. Sabhani*, 599 F.3d 215, 259-260 (2d Cir. 2010). Indeed, orders of restitution for victims of human trafficking can be life changing. Restitution can be a catalyst to independence and a critical factor in a sex trafficking survivor's efforts to avoid re-victimization. Restitution can fund much-needed transportation, which opens doors to employment and school; help pay for housing, food, and tuition; and allow the victim to access counseling for trauma or addiction. *See, e.g.*, *United States v. Rockett*, 752 F. App'x 448, 450 (9th Cir. 2018) (educational and occupational expenses); *United States v. Speights*, 712 F. App'x 423, 427 (5th Cir. 2018) (social support and transportation costs); *United States v. Dickey*, 52 F.4th 680, 687 (7th Cir. 2022) (future mental health treatment); *United States v. Snead*,

[2] The PSR states that restitution is mandatory under 18 U.S.C. § 3663A. (PSR ¶ 130.) However, as outlined in this section, restitution is mandatory under 18 U.S.C. §1593.

No. 21-4333, 2022 WL 17975015, at *5 (4th Cir. Dec. 28, 2022); (future medical and medical and mental health expenses and lost earnings); *United States v. Romero-Medrano*, No. 14-CR-050, 2017 WL 5177647, at *3 (S.D. Tex. Nov. 8, 2017), *aff'd*, 899 F.3d 356 (5th Cir. 2018) (education and vocational losses).

Title 18, United States Code, Section 1593(a) expressly requires that this Court "*shall* order restitution for any offense under this chapter," which includes the offenses of conviction. 18 U.S.C. § 1593(a) (emphasis added); *see also United States v. Baston*, 818 F.3d 651, 665-66 (11th Cir. 2016) (affirming restitution award under 18 U.S.C. § 1593 for "money that the victim earned while engaging in commercial sex for the defendant," and concluding that the district court erred in not awarding an additional $400,000 in restitution for extraterritorial trafficking conduct).

Section 1593(b)(1) further specifies that the defendant shall be ordered to pay "the victim. . . the full amount of the victim's losses," as defined in Section 1593(b)(3). Under that subsection, the "full amount of the victim's losses" includes the definition of losses set forth in 18 U.S.C. § 2259(b)(3), "and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor[.]" Section 1593(c) defines the term "victim" to mean an "individual harmed as a result of a crime under this chapter." *See United States v. Robinson*, 508 F. App'x 867, 870 (11th Cir. 2013) (concluding that named victim of charged sex trafficking offense fell "squarely within this definition"). The court also must order restitution "without consideration of the economic circumstances of the defendant." *See* 18 U.S.C. § 3664(f)(1)(A).

Regarding the proper calculation and determination of restitution, § 1593(b)(2) requires that any order of restitution be "issued and enforced in accordance with section 3664." Under 18 U.S.C. § 3664(e), the Government bears the burden of establishing the victim's losses by a preponderance of the evidence. "The amount of restitution can be determined on the basis of

evidence heard during trial, undisputed statements in the Presentence Investigation Report, or evidence presented at the sentence hearing." *United States v. Roberts*, 464 F. App'x 796, 802 (11th Cir. 2012); *see also Robinson*, 508 F. App'x at 871 (affirming restitution order for sex trafficking victim based upon trial testimony that "revealed the amount charged for [the victim's] services and the amount of time she worked for [the defendant].").

This Court "should establish the amount of the victim's losses with 'some reasonable certainty.'" *United States v. Saddler*, 789 F. App'x 952, 955 (4th Cir. 2019) (unpub.). "'So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution.'" *United States v. Futrell*, 209 F.3d 1286,1292 (11th Cir. 2000) (quoting *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993)); *see also United States v. Palmer*, 643 F.3d 1060, 1067-68 (8th Cir. 2011) (affirming award of $200,000 to a sex trafficking victim and noting that "the district court was only required to make a reasonable estimate, not establish the victim's future treatment costs with certainty"). The amount of restitution need not "be proven with exactitude" because "determining the dollar amount of a victim's losses attributable to the defendant will often be difficult" and "such a determination will inevitably involve some degree of approximation[.]" *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012); *see also United States v. Nash*, 558 F. App'x 741, 742 (9th Cir. 2014) ("the district court did not err by relying on the victims' sworn statements and the corroborating extrinsic evidence to establish the amounts earned and the time periods during which the victims were under [the defendant's] control. The district court appropriately estimated, based upon the facts in the record, the victims' losses with some reasonably certainty."); *United States v. Webster*, 2011 WL 8478276, at *9 (9th Cir. 2011) (multiplying the number of weeks trafficked by the average number of days worked per week times the average number of dates per day times the minimum amount

charged per date); *United States v. Lewis*, 791 F. Supp. 2d 81, 92 (D.D.C. 2011) (calculating value of the victim's services as the average amount earned by the number of days she worked for the defendant to determine the recoverable ill-gotten gains).

**B. <u>The Court Should Order the Defendant to Pay Restitution</u>.**

In this case, Sartor has pled guilty to two counts of violating 18 U.S.C. § 1591—a Chapter 77 offense—involving two named victims. This Court should order restitution in the total amount of $**259,800**, comprising payments to Victim 1 in the amount of $**173,800** and to Victim 2 in the amount of $**86,000**. In support of its restitution request, the Government highlights the following evidence pertaining to each victim for the Court's consideration.

1. *Victim 1*

Victim 1 met the Defendant in December 2024 when she was 23 years old. She immediately began performing commercial sex acts for his financial benefit on a daily basis in and around Baltimore, Maryland; Wilmington, Delaware; Philadelphia, Pennsylvania; Myrtle Beach, South Carolina; Atlanta, Georgia; Orlando, Florida; and Miami, Florida. (PSR ¶ 14.) Sartor kept all the money Victim 1 made from the commercial sex dates she performed. (PSR ¶ 14.) On a "low" day, Victim 1 would perform one commercial sex date for Sartor's benefit. (PSR ¶ 15.) On a :high" day, Victim 1 would perform ten commercial sex dates for Sartor's benefit. (PSR ¶ 15.) Sartor directed her to charge $160 for a "short stay," $260 for half an hour, and $400 for a full hour. (PSR ¶ 15.) She did not have any days off or sick days, and she always gave 100% of the money she earned to Sartor. Victim 1 stopped performing commercial sex acts for Sartor's financial benefit in April 2025.

Victim 1 will likely incur medical and psychological expenses because of Sartor's abuse – to include trauma-informed counseling, case management, court support, transportation, and

housing assistance. Accordingly, the Government's restitution calculation for Victim 1 is as follows: **120** (number of days Sartor had Victim 1 work for him in commercial sex) x **5** (average number of men Sartor instructed Victim 1 to have commercial sex dates with per day) x **$273** (average amount the Defendant charged each sex buyer) = **$163,800 + $10,000** (for anticipated future medical and psychological services) = $**173,800.**

2. *Victim 2*

Victim 2 was involved in commercial sex with Sartor from January 2025 through April 2025. (PSR ¶¶ 23-24.) Victim 2 made approximately $1,000 per day performing commercial sex acts, and Sartor took all the money she made. (PSR ¶ 25.) Except for the occasions when Victim 2 was hospitalized, she performed commercial sex acts for Sartor's benefit on a daily basis. Victim 2 may also incur medical and psychological expenses as a result of the Defendant's abuse.

Accordingly, the Government's restitution calculation for Victim 2 is as follows: **76** (number of days the Defendant had Victim 2 work for him in commercial sex) x **$1,000** (amount Victim 2 made on a daily basis in the Defendant's commercial sex enterprise) = **$76,000 + $10,000** ((for anticipated future medical and psychological services) = $**86,000.**

**CONCLUSION**

For the reasons articulated in this Sentencing Memorandum, the United States respectfully submits that a sentence of 365 months for Sartor is sufficient, but not greater than necessary, to promote the purposes of sentencing. The Government also requests that this Court order the Defendant to pay $**259,800** in restitution to the victims.

Dated: November 3, 2026

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: **Dwayne Williams**
DWAYNE EDWARD WILLIAMS
Assistant United States Attorney
Florida Bar No. 0125199
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9163
Fax: (305) 530-6168
Dwayne.Williams@usdoj.gov

A. TYSEN DUVA
Assistant Attorney General
Department of Justice
Criminal Division

__________/s/______________________
ELIZABETH HUTSON, VAB #85763
Trial Attorney
Human Rights and Special Prosecutions
Section

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Government's Sentencing Memorandum was served on all counsel of record through the ECF electronic filing system on November 3, 2026.

_________*/s/*_____________________
ELIZABETH HUTSON